FILED

**United States District Court**
**Northern District of Alabama**  03 JUN -4 AM 10: 10
**Southern Division**

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **Willow Bishop,** | ] | |
| Plaintiff(s), | ] | |
| vs. | ] | CV-02-CO-0205-S |
| **Compass Bank,** | ] | |
| Defendant(s). | ] | ENTERED |
| | | JUN 0 4 2003 |

**Memorandum of Opinion**

## I.   Introduction.

Presently before the court is a motion for summary judgment, filed by the defendant on March 3, 2003. [Doc. # 51.] Upon due consideration, the court is of the opinion that the motion is due to be granted.

## II.   Facts.[1]

The plaintiff, Willow Bishop ("Ms. Bishop") was hired by Nina Miranda ("Ms. Miranda"), the Vice President of Technical Support and Computer Operations for defendant Compass Bank ("Compass") on November 19, 1998, as a Project Manager for Compass. In July 1999, Ms. Bishop was promoted to the position of Manager of Analysts/JCL,[2] the

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] JCL stands for Job Control Language, and refers to the department that oversees the programs and systems used for computer-based data processing.



position in which she remained until her employment with Compass ended on November 6, 2000. Ms. Bishop's responsibilities included supervising the JCL Technicians, who reported directly to her, increasing the proficiency and talent level of the JCL Technicians through training, and ensuring that the JCL Department ran efficiently.

### A. The JCL Department and the Fed File.

The JCL Technicians are responsible for monitoring and verifying on-line and off-line processing and transmittal of bank data. On a daily basis, Compass transmits, through a computer data link, information and data regarding various bank transactions, including customer deposits and withdrawals, to the Federal Reserve Bank. This transmission is called the Fed File, and it must be successfully transmitted to the Federal Reserve Bank by midnight central time (1:00 a.m. eastern time) each night. The Fed File is automatically transmitted at approximately 9:00 p.m. each night, which allows the JCL Technician on duty the opportunity to correct any problems with the transmission prior to the midnight deadline. Each night, the Federal Reserve Bank sends Compass a verification that it has received the Fed File.

To ensure timely transmission of the Fed File, Ms. Bishop implemented a procedure whereby, in the event of an error, a highlighted error message appears on the console of the JCL Technician on duty alerting him to the fact that the Fed File has not been sent. The error message does not automatically disappear after some time passes; rather, the JCL Technician has to take affirmative steps to remove the error message from his computer screen. An additional safeguard in place is the nightly checkoff sheet each JCL Technician is required to keep. The JCL Technician is required to initial the sheet signifying that he

verified transmission of the Fed File by 9:00 p.m. There are also escalation procedures in place whereby a JCL Technician calls up the chain of command to report any problems in the Fed File's transmission.

The most critical duty of the JCL Technician who is on duty overnight is to verify that the Fed File acknowledgment has been received from the Federal Reserve Bank prior to the midnight deadline. If the Fed File is not transmitted in a timely manner, Compass is fined by the Federal Reserve Bank, and certain transactions do not get posted to the proper accounts, which can result in customers overdrawing their accounts. According to Charles Reid ("Mr. Reid"), Compass's Executive Vice President of Information Technology, a JCL Technician forgetting to ensure proper delivery of the Fed File to the Federal Reserve Bank is "like the Pope forgetting he's Catholic." (Reid Dep. at 51.)

**B.     The September 16, 1999, Fed File error.**

On September 16, 1999, while the JCL Department was under Ms. Bishop's supervision, the Fed File was not transmitted to the Federal Reserve Bank. Ms. Miranda sent a series of emails to Ms. Bishop informing her of the serious nature of the September 1999, error and that such an error could lead to the termination of Ms. Bishop and any JCL Technician making the error. Ms. Miranda instructed Ms. Bishop to emphasize to her JCL Technicians the importance of avoiding Fed File errors. According to Ms. Bishop, Ms. Miranda's emails "drove home" how critical the proper transmission of the Fed File was. (Bishop Dep. at 54.) After this incident, Ms. Bishop reviewed with the JCL Technicians the importance of the Fed File and that they had to ensure it was sent. Furthermore, Ms. Bishop

alleges that she reminded the JCL Technicians, including Jody Willingham ("Mr. Willingham"), about the midnight deadline.

### C. The April 2, 2000, Fed File error.

Another Fed File error occurred on or about April 2, 2000; the Fed File was not sent until after the midnight deadline on that date. Ms. Miranda and Mr. Reid discussed the error, and Mr. Reid informed Ms. Miranda that a Fed File error is the "most serious of errors" and that individuals responsible for the Fed File should be warned that such an error could "lead to possible termination." (Miranda Dep. at 59-60.) Ms. Miranda warned Ms. Bishop and all employees in the JCL Department, via a memorandum, that a Fed File error is "the most serious of errors" and can be grounds for termination. (Bishop Dep. at 68, *id.* Ex. 8.) After the April 2, 2000, incident Ms. Miranda and Ms. Bishop discussed the repeated problems with the Fed File and Ms. Miranda again informed Ms. Bishop that such an error in her department could be a "career stopper" for Ms. Bishop or anyone in her department. (Bishop Dep. at 69-70.) Ms. Bishop alleges that she asked Ms. Miranda if she could be fired because a JCL Technician failed to ensure timely transmission of the Fed File, and that Ms. Miranda responded that she could not. However, Ms. Miranda denies telling Ms. Bishop this. In any event, at this time, Ms. Bishop once again told the JCL Technicians how critical transmission of the Fed File was.

### D. Jody Willingham.

Mr. Willingham was hired by Ms. Bishop as a JCL Technician in November 1999. Prior to coming to Compass, Mr. Willingham had never worked at a bank, although he had worked in the technology field at previous jobs. When he began his employment at

Compass, Mr. Willingham attended a training class, the content of which is unknown to the court; other training he received was on an ad hoc, on-the-job basis from other JCL Technicians. This particular method of training for JCL Technicians was in place prior to Ms. Bishop's employment at Compass, and she did not alter the training procedures during her tenure at Compass. Mr. Willingham was initially assigned to the day shift; however, several months into his employment at Compass, he was transferred to the night shift. According to Ms. Bishop, Mr. Willingham had been on the night shift for eight or nine months by November 2000. Mr. Willingham testified that as of November 2000, he had no knowledge that transmission of the Fed File was time-sensitive; however, Ms. Bishop has alleged that she reminded all the JCL Technicians of the deadline after the September 1999, incident. Additionally, Mr. Willingham testified that he told Ms. Bishop at some point that he "still had a lot to learn" about his job. (Willingham Dep. at 126.)

### E. The November 2, 2000, Fed File error.

Mr. Willingham worked the night of November 2, 2000, and was responsible for verifying the successful transmission of the Fed File that evening. Chris Gilbert ("Mr. Gilbert"), a second JCL Technician, came to work at 10:00 p.m. that evening, and sometime after he arrived at work, he noticed a problem with the Fed File. Mr. Willingham and Mr. Gilbert contacted a Compass Analyst, who determined that there was a problem with the communication line between Compass and the Federal Reserve Bank. The connection was restored, the Fed File was eventually sent, and the acknowledgment from the Federal Reserve Bank was received. Thinking that transmission of the Fed File by 5:30 a.m.

discharged his duties, Mr. Willingham initialed the checkoff sheet indicating timely transmission of the Fed File.[3]

Ms. Bishop learned about the November 2, 2000, error the following morning when she reported to work. At that time, she contacted Mr. Reid and told him about the error in transmission of the Fed File. Ms. Bishop investigated the error, and found, by examining a log on the mainframe, that computer generated messages had been sent to the JCL Technician's console "all night," starting at 8:30 p.m. (Bishop Dep. at 106.)[4] Additionally, Ms. Bishop spoke to Mr. Willingham about the Fed File error, and he apologized to her and accepted responsibility for the failure.

### F.  Compass's investigation.

After learning about the November 2, 2000, incident, Mr. Reid spoke with Clayton Pledger ("Mr. Pledger"), Mr. Reid's direct supervisor. Mr. Pledger responded that Fed File transmission errors had happened "too many times" on Ms. Bishop's watch, and he instructed Mr. Reid to investigate the circumstances of the November 2, 2000, error. (Reid Dep. at 101.) Mr. Reid asked Henry Gaulden ("Mr. Gaulden"), who had replaced Ms. Miranda as Vice President of Technical Support and Computer Operations, to look into what happened with the Fed File on November 2, 2000. Mr. Gaulden asked Tommie Hames,

---

[3] Although Ms. Bishop alleges in her declaration that she notified the JCL Technicians of the time-sensitive nature of the transmission of the Fed File, Mr. Willingham denies having any knowledge of this fact prior to November 2, 2000. In fact, he testified that when he left on the morning of November 3, 2000, having ensured transmission of the Fed File by 5:30 a.m., "we felt like everything was okay, that it had been transmitted okay at the correct time." (Willingham Dep. at 107.)

[4] Mr. Willingham denies that any error messages appeared on his console that evening. Indeed, according to Mr. Willingham's testimony, the system whereby error messages appeared on the JCL Technician's console was not in place until sometime after November 2, 2000. (Willingham Dep. at 81-82.)

another Compass employee, to provide details as to what had occurred with respect to the Fed File error. Mr. Gaulden's recollection of his investigation into the incident is hazy at best,[5] but the evidence suggests that Mr. Gaulden reported to Mr. Reid that Mr. Willingham failed to verify the Fed File transmission because he was relatively new to the position and untrained in the Fed File process. Mr. Reid testified that his "understanding was [Mr. Willingham] didn't know a hill of beans about the Fed [File.]" (Reid Dep. at 78.)

### G. Ms. Bishop's termination.

Mr. Reid reported his findings about the Fed File error to Mr. Pledger and recommended that Ms. Bishop be terminated, because he believed that continued errors of this nature are the ultimate responsibility of the manager of the department in question. Mr. Pledger, along with Compass's Human Resources Director, agreed with Mr. Reid's decision to terminate Ms. Bishop's employment due to repeated Fed File errors on her watch. On Monday, November 6, 2000, Mr. Reid met with Ms. Bishop at 4:00 p.m. During that meeting, he gave her the option to resign and receive one month's severance pay, or be terminated. She chose to resign.

### H. Mr. Willingham's probation.

Mr. Willingham was placed on probation for sixty days for his responsibility for the Fed File error. He did not receive a pay cut or loss of benefits during his probation; rather, his probation merely delayed by sixty days a raise he was due. Mr. Reid ultimately concluded that Mr. Willingham should not be terminated because of his understanding that

---

[5] Mr. Gaulden testified that he has problems with his memory, and most of the excerpts of his deposition that have been submitted to the court consist of him responding "I don't recall" or "I don't remember" to the questions of counsel. (Gaulden Dep. at 28, 35-37, 38-39.)

Mr. Willingham was not properly trained in the Fed File process, which Mr. Reid concluded was "a management problem." (Reid Dep. at 78.) Mr. Willingham has not been disciplined since the November 2, 2000, incident, and there have been no further Fed File errors since that date.

### I. Procedural history.

On February 1, 2001, Ms. Bishop filed a charge of discrimination with the EEOC, alleging she was terminated based on her gender. She received her right-to-sue letter on November 2, 2001, and she filed the instant action on January 25, 2002. [Doc. # 1, Compl.] Ms. Bishop claims she was discriminated against in the termination of her employment with Compass on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17. Specifically, she claims that Mr. Willingham, a similarly situated male employee, was treated more favorably with respect to discipline than she was. Defendant filed the instant motion for summary judgment on March 3, 2003. [Doc. # 51.]

### III. Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV. Discussion.

### A. The legal framework.

Ms. Bishop alleges that she was subjected to discrimination with respect to discipline in that she was terminated for the Fed File error, while Mr. Willingham, the individual she perceives as primarily responsible for the error, received only a sixty day period of probation. She claims that she was treated more harshly than Mr. Willingham on the basis of her gender – female. "Whether an employer intentionally discriminated against an employee . . . is a question of fact, which may be proved either through direct or

circumstantial evidence." *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (citation omitted). Because Ms. Bishop has not alleged any facts to support a direct evidence case, she must prove her case through circumstantial evidence, using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* analysis, the plaintiff creates a rebuttable presumption of discrimination by proving a prima facie case of discrimination, which consists of proof that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she was subjected to discipline; and (4) a similarly situated employee outside the protected class who engaged in the same or similar misconduct was not disciplined similarly. *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1336 (11th Cir. 2000) (citations omitted). The defendant can rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for the challenged employment action. *Alexander*, 207 F.3d at 1336. Once the presumption is rebutted, the employer is entitled to summary judgment unless the plaintiff proffers evidence from which a reasonable factfinder could conclude that the reason articulated by the defendant is mere pretext for discrimination. *Id.*

**B.  Prima facie case of discrimination.**

Ms. Bishop has established that she is a member of a protected class – women – and that she was subjected to discipline. Therefore, the first and third elements of her prima facie case have been established. Moreover, because Compass does not argue that Ms. Bishop was not qualified for her job, the court assumes that Ms. Bishop can establish the second element of her prima facie case – that she was qualified for the job in question.

Thus, the only question remaining as to Ms. Bishop's prima facie case is whether she has established that a similarly situated employee outside the protected class was disciplined for similar behavior less harshly than she was. Ms. Bishop contends that Mr. Willingham is an appropriate comparator who was treated more favorably than her.

"In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified on other grounds by* 151 F.3d 1321 (11th Cir. 1998). The most important factors to consider in determining whether an employee is a proper comparator are the nature of the offenses committed and the nature of the punishments imposed. *Jones*, 137 F.3d at 1311. Indeed, "the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001). The offenses of the plaintiff must be similar in both quantity and quality to those perpetrated by the putative comparator. *See Silvera*, 244 F.3d at 1259 (putative comparator not similarly situated with Plaintiff where putative comparator had a record of one previous arrest, while Plaintiff had four previous arrests, three of which were for violent assaults); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (Plaintiff not similarly situated to employees who each committed a single policy violation where Plaintiff had committed at least four policy violations); *Jones*, 137 F.3d at 1312-13 (employees who allegedly committed single act of misconduct in one day not similarly situated to Plaintiff who had engaged in

multiple instances of misconduct on the same day). However, while the quantity and quality of the conduct engaged in by the plaintiff and the putative comparator must be similar, the putative comparator need not have the same job title as the plaintiff. *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999) (Plaintiff's direct supervisor could serve as a proper comparator).

The court is of the opinion that Mr. Willingham is not a proper comparator for two reasons. First, although both Mr. Willingham and Ms. Bishop were disciplined for their part in failing to transmit the Fed File on time on November 2, 2000, the specific conduct for which they were disciplined is simply not analogous. Specifically, Ms. Bishop was terminated because of her perceived failure to properly train and supervise the JCL Technicians, resulting in three Fed File errors, whereas Mr. Willingham was disciplined for neglecting to ensure transmission of the Fed File on one occasion. The court concludes that the conduct for which Ms. Bishop and Mr. Willingham were disciplined was not sufficiently similar in quality as to make Mr. Willingham an appropriate comparator.

Moreover, it is clear from the evidence that Ms. Bishop, as supervisor of the JCL Department, was involved in three Fed File errors, whereas the November 2, 2000, was Mr. Willingham's first and only Fed File error. The fact that a third Fed File error occurred under Ms. Bishop's supervision was apparently "the straw that broke the camel's back" as to her employment. *Jones*, 137 F.3d at 1313 (quoting *Rohde v. K. O. Steel Castings, Inc.*, 649 F.2d 317, 322 (5th Cir. Unit A June 1981)). Thus, Ms. Bishop's misconduct was not of a similar quantity as Mr. Willingham's misconduct. Because Ms. Bishop's conduct was dissimilar from Mr. Willingham's conduct in terms of quality and quantity, Mr. Willingham is not an

appropriate comparator. As such, Ms. Bishop cannot establish a prima facie case of gender discrimination, and summary judgment is due to be granted.

### C. Non-discriminatory reason for the adverse employment decision and proof of pretext.

However, even if Ms. Bishop had established a prima facie case of gender discrimination, Compass has articulated a legitimate, non-discriminatory reason for terminating Ms. Bishop, and she cannot establish that this reason is mere pretext for gender discrimination. Compass alleges that it terminated Ms. Bishop's employment because Fed File errors had occurred on numerous occasions under her supervision, and it attributed these errors to her failure to properly train the JCL Technicians. Assuming she could establish a prima facie case of gender discrimination, in order to prevail at the summary judgment stage, Ms. Bishop would have to amass evidence sufficient to permit a reasonable factfinder to conclude that this articulated reason is mere pretext for discrimination.

An employee cannot establish pretext "by simply quarreling with the wisdom of the [employer's] reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Rather, the employee must establish that the employer's proffered reason is "unworthy of credence, or that the defendant[ was] more likely motivated by a discriminatory reason." *Holfield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). To be unworthy of credence, the employer's proffered reason must be rife with "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998) Ultimately, "[t]he pretext inquiry is concerned with the employer's perception of the employee's performance, not the employee's own beliefs."*Id.*

at 1332-33. So long as the employer has a good faith belief that the employee engaged in conduct warranting termination, the employer is entitled to summary judgment. *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000).

Ms. Bishop argues that she has established pretext because Compass's allegation that she failed to properly train Mr. Willingham is false. She claims that Mr. Willingham was, in fact, trained properly, and that Compass's reliance on her alleged failure to train him is therefore pretext for discrimination. However, the court is of the opinion that Ms. Bishop has not established that Mr. Reid, the decision-maker at Compass, did not himself believe that Ms. Bishop failed to train Mr. Willingham. Indeed, the sincerity of Mr. Reid's belief in Ms. Bishop's failure to properly train and supervise her subordinates, as evidenced by three Fed File errors on her watch, is undisputed. Whether or not the underlying allegations against Ms. Bishop were true, Mr. Reid held a good faith belief that the three Fed File failures under her supervision were properly attributable to Ms. Bishop, and that her termination was therefore warranted. As such, Ms. Bishop cannot establish that Compass's articulated reason for terminating her is mere pretext for gender discrimination. *Cf. Total Sys. Servs.*, 221 F.3d at 1176 ("[A]n employer . . . is entitled to rely on its good faith belief about falsity, concealment, and so forth."). Therefore, even if she had established a prima facie case of discrimination, summary judgment in favor of the defendant would be warranted.

**V.     Conclusion.**

Because there is no evidence from which a reasonable factfinder could conclude that gender was a motivating factor in Ms. Bishop's termination, Compass's motion for

summary judgment is due to be granted. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___3rd___ of June, 2003.

L. Scott Coogler
United States District Judge